**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:24-cr-00034 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| KOREY STREATER | ) | |
| | ) | |
| | ) | NOVEMBER 21, 2024 |

**MEMORANDUM OF DECISION**
**RE: DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 28)**

Kari A. Dooley, United States District Judge

      On February 7, 2024, a federal grand jury returned a two-count indictment against Defendant Korey Streater charging him in Count One with the Unlawful Possession of a Firearm by a Felon in violation of Title 18 United States Code Section 922(g)(1) and in Count Two, Possession with Intent to Distribute Controlled Substances in violation of Title 21, United States Code Section 841(a)(1) and (b)(1)(C). Pending before the Court is Defendant's motion to suppress items seized from his vehicle on September 13, 2023, as well as statements that he made to law enforcement after the seizure as "fruits" of the unconstitutional search. He seeks an evidentiary hearing. The Government opposes the motion as well as the request for an evidentiary hearing. For the reasons that follow, the motion is DENIED.

**The Search**

      The events of September 13, 2023, leading up to and culminating in the search of Defendant's vehicle are largely agreed upon. On that date, federal law enforcement officials, to include ATF Resident Agent in Charge ("RAC") Scott Riordan ("Riordan"), were driving around New Haven Connecticut with an individual hoping to become a Cooperating Informant for the

ATF ("CI").[1] Gov. Opp'n., ECF No. 31, at 1–2. Also in the vehicle were ATF Task Force Officer and Hamden Detective Andrew Lipford ("Lipford") and Captain Craig Burnett of the Connecticut Department of Correction ("Burnett"). The CI provided information related to ongoing and historical criminal activity in the New Haven area. *Id.* at 3. When the officers returned the CI to his own vehicle which was parked near the Ikea in New Haven, the CI quickly slumped down and told the driver to keep driving. The CI explained that he saw a known gang member and narcotics dealer at an electric vehicle charging station. *Id.* at 4; Riordan Aff., ECF No. 31-1 at ¶ 8. The individual was identified as Korey Streater and described as driving a white Tesla automobile that was plugged in and charging.[2] Gov Opp'n at 4. He described Streater as having spent time in prison and as being currently on probation. *Id.*; Riordan Aff. at ¶ 8. He said Streater was wearing a red baseball style cap. Gov. Opp'n at 5–6. The CI told the officers that Streater was armed; that he had seen him with a firearm on multiple occasions to include on the previous day. *Id.* at 4. Finally, the CI told the officers that Streater was in possession of a thermos in which he stores PCP and that

---

[1] The CI has, to date, not been identified.
[2] Defendant noted in his motion that the New Haven Police Department report for the arrest indicated that the CI placed Defendant "in the area of Ikea located at 450 Sargent Drive," when his vehicle was actually "plugged into a charging station adjacent to 500 Sargent Drive," which is the address of the Hotel Marcel. Mot. to Suppress, ECF No. 28, at 4. Defendant again made this distinction in his reply brief, noting that "In their reports and affidavits, the officers also repeatedly misstate the location of the arrest as the IKEA parking lot," while more accurately "[the] charging station is operated by Tesla… while the lot is owned by Hotel Marcel." Def.'s Reply, ECF No. 32, at 11. Defendant contends that "[s]uch conspicuous oversight of key factual details calls into question the officers' other representations in their affidavits and warrants cross-examination under oath." *Id.* The Court, however, after reviewing publicly available satellite imagery, takes judicial notice of the fact that the Ikea and Hotel Marcel parking lots in question are expansive, and could easily be construed as one continuous lot. *See* https://www.google.com/maps/place/IKEA/@41.297139,-72.9196346,233m/data=!3m1!1e3!4m6!3m5!1s0x89e7d839d23fb2ad:0xae7acd48933e86c0!8m2!3d41.2957957!4d-72.9199735!16s%2Fg%2F1ts_7m_g?authuser=0&entry=ttu&g_ep=EgoyMDI0MTExMC4wIKXMDSoASAFQAw%3D%3D (last visited Nov. 12, 2024); *United States v. Sessa*, No. 92-CR-351 ARR, 2011 WL 256330, at *25, n. 12 (E.D.N.Y. Jan. 25, 2011), *aff'd*, 711 F.3d 316 (2d Cir. 2013); *United States v. Dantzler*, 117 F. Supp. 3d 198, 206, n. 7 (E.D.N.Y. 2015); *United States v. Little*, 640 F. Supp. 3d 306, 322, n. 9 (S.D.N.Y. 2022).

Streater had the thermos with him whenever the CI saw him. *Id.* at 4–5. Riordan confirmed Streater's status as a convicted felon. *Id.* at 5.

Thereafter, Riordan contacted the New Haven Police Department (NHPD) to see if the crime suppression unit was available to interdict the vehicle and its driver. *Id.* at 5–6. When NHPD officers arrived on scene, they confirmed the location of the white Tesla, and that the driver matched the description they had been given. *Id.* at 6–7. Officers then approached, blocked and surrounded the vehicle. *Id.* at 7. The Defendant was removed from the vehicle and the officers proceeded to search the vehicle.[3] In a "fanny pack" or cross-over bag, the officers located a Smith & Wesson SWV40E .40 caliber pistol. *Id.* at 8; Riordan Aff. at ¶ 11. In the center console of the rear seat, the officers seized a thermos which contained narcotics, to include PCP. *Id.* at 8–9; Mastroianni Aff., ECF No. 31-3, at ¶ 19. The Defendant was arrested on site and transported to the NH Police Department where he was interviewed by Riordan and NHPD Sergeant Mastroianni. Gov. Opp'n at 9. During the interview, the Defendant acknowledged possession of both the firearm and the narcotics seized from the vehicle. *Id.* He revealed that he sold narcotics to supplement his income because he had lost his job and detailed how and when he came into possession of the firearm. Riordan Aff. at ¶ 12.

On February 7, 2024, a federal grand jury returned a two-count indictment arising out of the events of September 13, 2022, charging the Defendant with Unlawful Possession of a Firearm by a Felon (Count One) and Possession With Intent to Distribute Controlled Substances (Count Two). Indictment, ECF No. 1, at ¶¶ 1–2. The Defendant seeks to suppress the items seized from

---

[3] The parties disagree as to whether the Defendant's fanny pack was observed prior to the search of the vehicle and the impact of such an observation, if any, on the determination of probable cause. The Defendant asserts that the fanny pack is an innocuous item which provides no basis for suspicion. Def.'s Reply, ECF No. 32, at 12–13. The Government avers that a fanny pack is known to law enforcement as something regularly used by criminals to hold and transport firearms and other contraband. Gov. Opp'n at 7–8; Mastroianni Aff. at ¶¶ 6–7. In watching the bodycam video, it is not clear to the Court whether the search began before the fanny pack was spotted or after.

his vehicle as well as his post-arrest statements on the grounds that the warrantless search of the vehicle was not supported by probable cause and that his statements are "fruits" of the illegal search of his vehicle. Mot. to Suppress, ECF No. 28, at 2–3. In support of the motion to suppress, the defendant submitted an affidavit regarding the approach by law enforcement and the subsequent search of his vehicle. *See* Streater Aff., ECF No. 28-1. Aside from the legal conclusions contained within, the affidavit is largely undisputed and is consistent with the facts set forth above and the bodycam video. In the motion to suppress, the Defendant argues that the paltry information provided by the CI, as uncorroborated statements of an untested and unknown source of information who was as yet not "signed up" as an informant, cannot support a finding of probable cause.[4] Mot. to Suppress at 6–7, 12–13; Gov. Opp'n at 2, n. 1. In response, the Government submitted the affidavits of Riordan, Lipford and NHPD Sergeant Mastroianni as well as NHPD incident reports from September 13, 2023. *See* ECF Nos. 31-1 to 31-4. Therein, as will be discussed below, the government refutes any assessment of the CI as untested, untrustworthy, or of questionable reliability. Presented with this more robust development of the record regarding the CI, the Defendant seeks an evidentiary hearing to challenge these assertions and the reliability of the CI through cross-examination of the law enforcement affiants. Def.'s Reply, ECF No. 32, at 9.

Having considered all of the submissions, the Court concludes that the motion to suppress should be denied and that no evidentiary hearing is necessary in order to render that decision.

**The Fourth Amendment—The Automobile Exception**

---

[4] The Defendant also contests, and the parties brief in the alternative, whether the events of September 13, 2023, could fairly be characterized as a *Terry* stop that ripened into probable cause. Gov. Opp'n at 22; Def.'s Reply at 2. As the Court concludes that probable cause for the search existed before the stop, it does not address the competing alternative narratives under which the warrantless search was justified or not.

4

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (quoting U.S. Const. amend. IV). "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "In most cases, reasonableness requires a warrant and probable cause." *United States v. Lifshitz*, 369 F.3d 173, 178 (2d Cir. 2004). Indeed, searches conducted without a warrant are "'*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010) (quoting *Katz v. United States,* 389 U.S. 347, 357 (1967)). "Once a defendant with a reasonable expectation of privacy in the area searched challenges a warrantless search as unreasonable under the Fourth Amendment, the burden is on the government to demonstrate that the search was within one of the recognized exceptions." *United States v. Peña Ontiveros*, 547 F. Supp. 2d 323, 330 (S.D.N.Y. 2008), *aff'd sub nom. United States v. Rico Beltran*, 409 Fed. App'x 441 (2d Cir. 2011).

Relevant here, the "automobile exception" allows police to "conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004). The Supreme Court has articulated two "distinct theories" that underpin this exception: first, that individuals have a lower expectation of privacy in their vehicles than in their homes, and second, that the inherent mobility of vehicles creates an exigency for law enforcement. *See United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007); *Navas,* 597 F.3d at 497. The permissible scope for a search under the automobile exception "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S.

5

798, 824 (1982). Therefore, if the probable cause justifying a search includes the entire vehicle, "the permissible scope of the search pursuant to this exception includes every part of the vehicle and its contents including all containers and packages that may conceal the object of the search." *United States v. Wilson*, 699 F.3d 235, 246 (2d Cir. 2012) (internal quotations and citations omitted).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. Probable cause is assessed based upon the totality of the circumstances and may be found where a law enforcement official "has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Howard,* 489 F.3d at 491 (quoting *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006)). "[P]robable cause is a flexible, common-sense standard ... [and] the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Texas v. Brown,* 460 U.S. 730, 742 (1983) (citation and internal quotation marks omitted). Finally, the government bears the burden of establishing probable cause for a warrantless search of a vehicle under the automobile exception. *United States v. Feliz*, 657 F. Supp. 2d 364, 371–72 (E.D.N.Y. 2009).

**Discussion**

The motion to suppress therefore turns on the question of whether, under the totality of the circumstances, to include principally the probative value of the information provided by the CI, there was probable cause to believe that the Defendant's vehicle contained contraband.

**Probable Cause**

When a reliable and proven confidential informant provides information that is in significant measure verified or corroborated, a judge may rely upon other of his statements in finding probable cause. *See Adams v. Williams*, 407 U.S. 143, 147 (1972) (Police may rely on information provided by a confidential informant to establish probable cause where the information "carrie[s] enough indicia of reliability to justify the officer's [reliance]."). Information from an informant who is known to law enforcement requires less corroboration and may be relied upon in light of the historical reliability of the informant. *United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007). "'[I]nformation provided by an informant from whom the government has received consistently reliable information in the past is likely to be sufficiently reliable to establish probable cause....'" *United States v. Soto,* 52 F. App'x 534, 535 (2d Cir. 2002) (quoting *United States v. Wagner,* 989 F.2d 69, 73 (2d Cir.1993)).

Although the defense had available only the materials provided in discovery, the Government has since provided additional information germane to the motion to suppress. By Affidavit, RAC Riordan explains: In the summer of 2023,[5] Riordan learned from Burnett that he knew a CI who was looking to provide assistance in an ongoing ATF New Haven gang investigation. Riordan Aff. at ¶ 5. Burnett told Riordan that the CI had been providing reliable and credible information to Burnett for over a decade, which included gang intelligence, prisoner intelligence, and information regarding contraband within DOC facilities. *Id*. Burnett told Riordan that the CI provided a lot of valuable corroborated information and had not ever misled Burnett. *Id.* Riordan was himself familiar with the CI because the CI had assisted the Hamden Police Department by providing information which led to the arrest of a known gang member in June 2023. *Id.* Riordan was also aware that the CI had provided information to federal authorities in 2012 in relation to a large-scale gang prosecution. *Id.* At that time, the CI agreed to be "signed up" by the ATF and to testify as may be necessary. *Id.* Prior to the date of the Defendant's arrest, Riordan was also aware that the CI had met with investigators and provided

---

[5] The Affidavit indicates that the contact was in 2024, which the court assumes is a typographical error as the affidavit then continues to describe the events leading up to the September 13, 2023, arrest of the Defendant.

7

information regarding an ongoing ATF gang investigation. *Id*. at ¶ 6. It was in light of these events that Riordan suggested that he, Lipford and Burnett meet with the CI to drive around the New Haven area to allow the CI to point out and confirm locations of significance that the CI had previously identified. Riordan further explains that he and the others drove around for over an hour during which the CI provided information to Riordan and the others. *Id.* at ¶¶ 6–7. Riordan believed the CI to be truthful, in part, because much of what the CI told him was already known to law enforcement (and thus corroborated) through other sources. *Id.* at ¶ 7.

Similarly, by affidavit, Lipford explains that the meeting with the CI was arranged to allow the CI to continue to demonstrate trustworthiness and credibility with federal law enforcement comparable to the manner in which the CI had collaborated with other law enforcement. Lipford Aff. at ¶ 7. On September 13, 2023, Lipford was aware of the CI's informant relationship with Burnett; that the CI had provided information to the Federal Bureau of Investigation; and that the CI had assisted the Hamden Police Department in recent investigations into violent crimes in Hamden. *Id.* at ¶ 7–8. Lipford then details the timing, nature and scope of the CI's information regarding acts of violence in Hamden. *Id.* at ¶ 8. The CI had provided accurate and corroborated information on a number of topics beginning in April 2023 and continuing into September 2023. *Id.*

Finally, the Government submitted the affidavit of Sergeant Jeremy Mastroianni, who participated in the stop of the Defendant's vehicle and the Defendant's arrest. Mastroianni was assigned to a unit conducting crime suppression in New Haven on September 13, 2023. Mastroianni Aff. at ¶ 9. NHPD Detective Huelsman advised Mastroianni that Riordan had told Huelsman that Korey Streater was in the area of IKEA, located at 450 Sargent Drive, operating a white Tesla which was currently plugged in and charging. *Id.* at ¶ 11. Mastroianni was advised that Streater was in possession of a firearm and a large amount of illegal drugs. *Id.* Streater was described as a dark complected black male wearing a red baseball hat. *Id.* Officers then obtained both DMV and arrest photos of Streater and also determined that he was a convicted felon. *Id.* at ¶ 12. Upon arriving on scene, Mastroianni observed

8

the white Tesla at the charging station and the driver, a black male wearing a red baseball cap. *Id.* at ¶ 13. Satisfied that this was the vehicle and the driver about whom the information had been provided, the officers interdicted the vehicle; searched the vehicle and thereafter arrested the Defendant. *Id.* at ¶¶ 15–21.

As discussed above, the CI quickly slumped in his seat and asked Riordan to keep driving as they approached the location of the CI's vehicle. The CI explained that Korey Streater, a gang member and street level narcotics dealer, was in the white Tesla at the charging station. The CI advised that he had seen Streater armed with a firearm on multiple occasions and in fact had seen Streater with a firearm the previous day. Riordan Aff. at ¶ 8. He advised that Streater sells PCP, which he transports and stores in a thermos which had been in Streater's possession whenever the CI saw him. *Id.* The detail regarding the thermos was particularly significant as PCP, a powerful chemical compound, is often stored and transported in glass or metallic containers. Lipford Aff. at ¶¶ 14–15. Law enforcement confirmed Streater's status as a convicted felon. Riordan Aff. at ¶ 9.

Given the CI's lengthy and proven track record of providing truthful and corroborated information, under the totality of the circumstances, law enforcement had probable cause to search the Defendant's vehicle. Indeed, "there [was] a fair probability that contraband or evidence of a crime [would] be found in" the vehicle. *Gates,* 462 U.S. at 214.

**Evidentiary Hearing**

In his motion, the Defendant seeks an evidentiary hearing to allow him the opportunity to test the officers' assertions regarding the reliability and history of the CI. The Defendant also seeks the identity of the CI so that he may challenge the basis for his knowledge as well as law enforcement's decision to rely on the CI's information.

A defendant is entitled to an evidentiary hearing if he can demonstrate a contested issue of material fact. *United States v. Pena,* 961 F.2d 333, 339 (2d Cir.1992). The defendant must offer "sufficiently definite, specific, detailed, and nonconjectural" information so as to enable the court to

conclude that there are contested facts which go to the validity of the search. *Id.* To satisfy this obligation, a defendant must submit sworn factual allegations from a person with personal knowledge of the events at issue. *United States v. Viscioso,* 711 F.Supp. 740, 745 (S.D.N.Y.1989). In the absence of such an affidavit, no evidentiary hearing is required. *Id.* Nor is a hearing required if the defendant's allegations are general and conclusory. *Id.* As discussed above, the facts contained in the Defendant's affidavit in terms of how the stop, search and arrest occurred are not in dispute. And his conclusory allegations do not warrant a hearing. *See United States v. Castellano,* 610 F.Supp. 1359, 1439 (S.D.N.Y.1985). *Cf. United States v. Shamsideen,* 2004 WL 1179305 (S.D.N.Y. 2004) (Although Defendant's conclusory submission did not trigger entitlement to a hearing, the Court convened a hearing nonetheless where the Government failed to offer any information which would permit the Court assess whether it was reasonable for law enforcement to rely upon an informant.) In *Shamsideen,* the issue before the court was the validity of a *Terry* stop. The Court observed that "[i]t is impossible to determine the reasonableness of [the decision to stop the defendant] without any representation by the Government regarding the informants – how they are known, how long have they been known, how reliable are they known to be, how long have they worked with the police, etc." *Id.* at *10. Here, these questions are answered, and the Defendant offers only speculation (and skepticism) that an evidentiary hearing will call into question the CI's reliability and the decision to rely upon the CI. As such, no hearing is required.

**Disclosure of CI's Identity**

Finally, the defendant seeks disclosure of the CI's identity. It is well-established that the Government enjoys a "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *See e.g. Roviaro v. United States,* 353 U.S. 53, 59 (1957). However, "where the disclosure of an informer's identity, … is relevant and helpful to the defense of an accused, or is essential to a fair determination of a

cause[]" the privilege gives way. *Id.* at 60–61. Courts must "balance the public interest in protecting the flow of information against the individual's right to prepare his defense." *United States v. Jackson,* 345 F.3d 59, 70 (2d Cir. 2003) (cleaned up). The burden is on the defendant to demonstrate that the need for disclosure of an informant's identity outweighs the Government's interest in his or her anonymity. *Shamsideen,* 2004 WL 1179305 at *11.

Courts have held "that the need for disclosure is far less compelling when it is sought in connection with pretrial issues, such as the propriety of search or seizure, which do not bear upon the ultimate question of guilt or innocence." United States v. Manley, 632 F.2d 978, 985 (2d Cir. 1980); *see also McCray v. Illinois,* 386 U.S. 300, 311-112 (1967). The Second Circuit "has taken the view that while disclosure is not absolutely precluded when sought in regard to a suppression hearing, it will be deemed appropriate only where the information supplied by such persons constitutes the "essence," "core" or "main bulk" of the probable cause…" at issue. *Manley*, 632 F.2d at 985. The Court agrees that the probable cause to search the vehicle largely, though not entirely, came from the CI. However, the Government's interest in maintaining the privilege still outweighs the Defendant's interest in obtaining the CI's identity.

First, having the CI's identity will not change the nature of the information provided to law enforcement. And it is this information, coupled with the well-documented reliability of the CI, that established probable cause for the search of the vehicle. Thus, there is no obvious value to the defense in connection with the motion to suppress. And although the CI's identity might allow for a more fulsome development of the record for purposes of assessing the CI's credibility, given the CI's lengthy history and well-documented reliability, which was known to Riordan, Lipford, and Burnett, this effort would be of *de minimis* value. When this *de minimis* interest is weighed against

11

the significant personal risk to the CI and the potential to disrupt or compromise the Government's investigative efforts, it is manifest that disclosure is not warranted.

**Good Faith**

The Fourth Amendment does not require automatic suppression of improperly seized evidence. *United States v. Smith*, 967 F.3d 198, 211 (2d Cir. 2020). Rather, "the exclusionary rule is a judicially-created mechanism of safeguarding against unreasonable searches and seizures – violations of the Fourth Amendment – primarily through its deterrent effect." *United States v. Hightower*, 950 F.3d 33, 36 (2d Cir. 2020). The value of that deterrent effect "varies with the culpability of the law enforcement conduct." *Herring v. United States*, 555 U.S. 135, 143 (2009). As such, "the exclusionary rule applies only if the police have violated the Constitution deliberately, recklessly, or with gross negligence, or if a constitutional violation is the product of recurring or systemic negligence." *Smith*, 967 F.3d at 211. (citing *Davis v. United States*, 564 U.S. 229, 236–40 (2011)). Therefore, "if the police have otherwise acted mistakenly but in objective good faith that they have not violated the Fourth Amendment, then the remedy of suppression is not appropriate." *United States v. Salaman*, No. 3:22-CR-76 (JAM), 2024 WL 3565248, at *6 (D. Conn. July 29, 2024). To determine whether officers acted with objective good faith, a court must ask ""whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances."" *Id.* (quoting *Herring* 555 U.S. at 145). Exclusion is not appropriate in instances where the police have "acted mistakenly but in objective good faith that they have not violated the Fourth Amendment." *Id*. In such cases the cost of exclusion—which "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence"— outweighs its deterrent benefits. *Davis*, 564 U.S. at 237.

Here, although the Court has concluded that law enforcement had probable cause to search the Defendant's vehicle, the conclusion was not an obvious one. Indeed, the Defendant has presented a cogent and logical argument, though ultimately unpersuasive, that no probable cause existed. Thus, even if the Court had agreed with the Defendant on this close call, the Court could not conclude that law enforcement acted with deliberate or reckless disregard for the Defendant's Fourth Amendment rights. Even if mistaken, law enforcement's good faith belief in the existence of probable cause was reasonable and would therefore preclude suppression.

**Conclusion**

For all of the foregoing reasons the motion to suppress is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 21st day of November 2024.

        */s/ Kari A. Dooley*
        KARI A. DOOLEY
        UNITED STATES DISTRICT JUDGE